J-A17038-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MARGARET A. CIKOVIC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BERNARD K. CIKOVIC | : | |
| | : | |
| Appellant | : | No. 70 WDA 2025 |

Appeal from the Decree Entered January 8, 2025
In the Court of Common Pleas of Washington County
Civil Division at No: CV 2021-4243

BEFORE:  McLAUGHLIN, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:               **FILED: September 9, 2025**

Bernard K. Cikovic (Husband) appeals from the divorce decree which finalized the resolution of the parties' respective economic claims. After careful review, we affirm.

BACKGROUND

Husband and Margaret A. Cikovic (Wife) were married for 29 years; they married in February 1992 and separated in July 2021. The trial court explained:

Two children were born of this marriage, both of whom are adults. [Wife] resides in Florida. She was born on June 17, 1960. She is employed as a flight attendant for American Airlines and has been employed since 1986. Husband resides in Florida as well, although he currently has exclusive possession of the marital property [in] Burgettstown, PA … (hereinafter the "Cikovic Family Farm" or "Farm"). Husband grew up in the farmhouse at the Cikovic Family Farm. He was born on November 12, 1952. He was employed in the personal financial consulting field but is now retired.

> After the parties' separation date of July 14, 2021, Wife initially retained exclusive possession of the [Farm] pursuant to an agreement reached by the parties at a [petition from abuse (PFA)] proceeding. A [c]onsent [o]rder was entered on July 14, 2021, in which the parties agreed to Wife['s] having sole and exclusive possession of the [Farm]. … Wife exercised exclusive possession of the marital residence from the date of separation until May 17, 2022. Husband paid the mortgage, taxes, and insurance payments during the period of time that Wife had exclusive possession…. Husband spent approximately $23,000 relating to Cikovic Family Farm expenses … while Wife had exclusive possession.
>
> The parties entered into oil and gas lease agreements during their marriage regarding the Cikovic Family Farm. A [q]uitclaim [d]eed was executed on June 27, 2011, that conveyed Wife's oil, gas and mineral rights (hereinafter sometimes referred to as "OGM rights") to Husband. Wife was not aware of what she was signing because Husband handled all marital financial issues. Husband created an LLC called "Jefferson Resources, LLC" and transferred his interest in the OGM rights to Jefferson Resources, LLC in April of 2013. Husband unilaterally sold the OGM rights relating to the Cikovic Family Farm to a third party in April of 2021 for approximately $717,000. The proceeds from the sale were deposited into a Jefferson Resources, LLC account and subsequently transferred to Schwab Account (x3561).
>
> On July 6, 2021, Husband transferred $400,000 to each of [the parties'] two children (totaling $800,000) from Schwab account (x3561). The transfer of $800,000 in marital funds occurred approximately one week after the parties physically separated following a dispute at the residence on or about June 30, 2021. … The transfer of $800,000 to the parties' children was primarily funded by the sale of the OGM rights for $717,000.

Trial Court Opinion (TCO), 1/22/25, at 3-5 (citations and footnotes omitted).

On July 6, 2021, Wife filed a complaint for divorce and raised claims for equitable distribution, alimony, and counsel fees/expenses. Shortly after, the trial court granted the parties' request to receive $50,000 each as an advance distribution of the marital estate. Order, 8/9/21. On December 28, 2021, the

court authorized a second "$50,000 distribution from their respective IRA accounts as an advance to equitable distribution." Order, 12/28/21. On March 2, 2022, Husband filed a petition raising claims for alimony *pendente lite*, alimony, and exclusive possession of the Farm. On July 15, 2022, the trial court appointed a Divorce Hearing Officer (DHO) "to hear testimony and return the record and a transcript of the testimony to the [c]ourt, together with a report and recommendations concerning the [parties'] claims." Order, 7/15/22.

The DHO held hearings on February 21-22, 2023, and issued a 70-page report and recommendation (First Report and Recommendation) on June 23, 2023. The First Report and Recommendation included an index with headings and sub-headings referencing findings of fact, conclusions of law, and the recommended distribution of marital property. **See** First Report and Recommendation at 1-70. The DHO noted that the parties' main dispute concerned "Husband['s] transferring $400,000 to each of his children (total $800,000) from a Schwab investment account on July 6, 2021." **Id.** at 5. The DHO discussed the evidence and law, including the statutes and factors pertaining to equitable distribution and alimony. **Id.** at 59-68 (DHO addressing 23 Pa.C.S. §§ 3502(a) and 3701(b)).

The DHO did not recommend that either party receive alimony, alimony *pendente lite*, or counsel fees/expenses. **Id.** at 53. With regard to equitable distribution, the DHO found that Husband had dissipated the marital estate by transferring $800,000 to the parties' children. Thus, the DHO concluded

- 3 -

Husband "should be charged with receiving $800,000 of the marital estate."

*Id.* at 39.  Adding back the $800,000, the DHO calculated the "total value of

marital assets [to be] $2,329,290." *Id.* at 50.  The DHO determined the net

value of the Farm was $163,634, and recommended that each party be

awarded an equal share of $81,817.  *Id.* at 51.  The DHO further

recommended that "remaining valued assets [be] distributed 52% to Husband

and 48% to Wife based upon the evidence and in consideration of the

[statutory] factors [regarding equitable distribution in] Section 3502 of the

Divorce Code."  *Id.* at 51.  In total, the DHO recommended that Husband

receive assets valued at $1,229,468, and that Wife receive assets valued at

$1,099,822.  *Id.* at 53.  Husband's recommended award included the Farm;

it also included a portion of proceeds from the sale of oil and gas rights that

Husband initially deposited with Jefferson Resources, LLC, transferred to

Schwab Account x3561, and ultimately transferred to the parties' children.

*Id.* at 55.  Wife's recommended award was comprised primarily of investment

and retirement accounts.  *Id.*  Both parties filed exceptions.

The trial court explained:

Oral argument was held on September 19, 2023.  On October 12, 2023, th[e c]ourt issued an [o]rder denying Husband's exceptions in … entirety[,] and granting Wife's sole exception.  The case was remanded back to [the] DHO … for additional proceedings to "determine if it is necessary to redistribute the Chase Account No. xx0021, Bank of America Account No. xx7471, Bank of America Account No. xx1889, and the marital residence located at [the Farm] to effectuate the financial distributions as set forth in the [DHO's] Report and Recommendation…."

- 4 -

On November 28, 2023, the first Remand Hearing was held before [the] DHO[,] who issued a Remand Report and Recommendation dated December 11, 2023. Husband filed [e]xceptions to [the] DHO's Remand Report and Recommendation on December 28, 2023. The [trial c]ourt, after oral argument, entered an [o]rder dated April 9, 2024, denying all of Husband's exceptions except for Husband's Exceptions No. 11 and 13. The case was once again remanded to the DHO … to 1) determine if Husband paid $18,000.00 to the Internal Revenue Service for the [p]arties' joint tax obligations and 2) determine if Husband shall be given an offset for any marital expenses paid by Husband during Wife's period of exclusive possession of the Cikovic Family Farm.

On June 4, 2024, a second Remand Hearing was held before [the] DHO[, who] issued a Second Remand Report and Recommendation dated June 25, 2024. Husband filed [e]xceptions to the [DHO's] Second Remand Report and Recommendation dated June 25, 2024…. Oral argument was held September 25, 2024, and th[e c]ourt entered its Memorandum and Order on October 22, 2024. The [c]ourt denied all [but one] of Husband's exceptions and adopted the [DHO's] Second Remand Report and Recommendation apart from Exception No. 7. The [c]ourt granted Husband's Exception No. 7 and struck language from the DHO's recommended order regarding pre-judgment interest….

TCO at 9-11.

The trial court adopted the DHO's First Report and Recommendation, and the "Remand Report and Recommendation dated December 11, 2023, which were incorporated with the Second Remand Report and Recommendation." *Id.* at 1 n.1. The court further observed:

Husband testified that the transfer of $400,000 to each of the children was done to 1) help both children pay off their student loans and 2) provide each child with a $300,000 deposit so they could "purchase their homes." Husband testified that there was no other motivation for him to make that payment[,] as his motivation was so that he would be consistent with his desire to wind down his business, pay bills, and pay the children. Husband testified that this plan was discussed with Wife. The testimony

- 5 -

presented at trial differed as to the intended purchase of a home. Wife testified that she, along with Husband and their two children, were actively looking at prospective houses together with the intent of having all four names on the title to the real property. Wife further testified that there was no agreement to use marital funds to purchase a residence solely for the children and she would not have agreed to transfer $800,000 to the adult children.

Husband testified that the parties and the children had conversations around the dinner table regarding the plan to sell the OGM royalties and give the proceeds to the children as their inheritance. Husband explained that he, Wife and the children discussed this plan *ad nauseam*. Husband transferred the $800,000 to the children with the understanding that the children would use the funds to pay off school loans and purchase "homes."

The parties' son … testified that the parents entered into an agreement with the children to give each of them $400,000 after the sale of the OGM rights. Wife received no consideration for the transfer of the $800,000 to the children.

Both children testified that approximately $600,000 of the $800,000 was used as a nonrefundable down payment on the purchase of a single home in Connecticut with a purchase price of approximately $1,500,000. Both children refused to answer questions regarding the details of the property that was purchased. The parties' son was not willing to disclose the address of the home. [He] testified that the purchase of the home involved a life estate but did not disclose the owner's identity. [T]he parties' daughter also testified that the down payment was irrevocable. The children did not consult Wife or Husband regarding this purchase.

Wife testified that she contributed approximately $215,000 of non-marital monies to the marriage through the sale of her non-marital Grayson Bankshares, Inc. stock at Husband's behest in September of 2009. Husband inherited an undetermined amount of money from his father when his father passed. The inherited funds were held in a joint account owned by Husband and his father, and subsequently converted into Schwab Account (x3561) in Husband's name after his father died.

Husband voluntarily retired June 30, 2021. Wife testified that she was not aware of Husband's retirement. At the time of the initial hearing, Wife wanted to retire, as she has "a severe cyst on [her] spine and two disc problems in [her] lower back." Husband

thought Wife wanted to continue to work. Also on June 30, 2021, Husband paid himself $40,000 by a personal check. On July 1, 2021, Husband withdrew $2,200.00 from the Bank of America Account No. xx7471.

The record evidence demonstrates that Husband paid $18,000.00 to the Internal Revenue Service … on July 23, 2021, which was approximately nine (9) days after the parties separated. Husband asserts that the payment was for estimated quarterly income taxes.

*Id.* at 5-7 (citations omitted).

Husband filed a notice of appeal from the October 22, 2024 Memorandum and Order on November 18, 2024. However, the appeal was quashed because no divorce decree had been entered. ***See, e.g., Fried v. Fried***, 501 A.2d 211 (Pa. 1985) (holding that divorce issues are reviewable only after the entry of a final decree). A divorce decree was entered on January 8, 2025, and Husband filed the underlying appeal on January 9, 2025.

ISSUES

Husband presents ten questions for review:

1. Whether the trial court abused its discretion and committed clear error(s) of law in concluding that [Husband's] transfer of $800,000 dollars for the benefit of the parties' children constituted a dissipation of the marital estate?

2. Whether the trial court abused its discretion and committed clear error(s) of law in including the $800,000 in the marital estate and charging it against [Husband] as an advance on equitable distribution?

3. Whether the trial court abused its discretion, committed error(s) of law, and committed clear and unmistakable accounting errors by charging [Husband] with an advance on equitable distribution for proceeds that were simply transferred from one account to another?

4. Whether the trial court abused its discretion and/or committed error(s) of law in charging [Husband] with receiving advances on equitable distribution for proceeds that were spent on joint marital obligations?

5. Whether the trial court abused its discretion and/or committed a clear error of law in ordering a distribution of 91% ($984,879) of the marital estate available for distribution to [Wife]?

6. Whether the trial court abused its discretion and committed error(s) of law in its analysis, findings, and conclusion that [Husband] was not entitled to alimony?

7. Whether the trial court abused its discretion and committed error(s) of law in its analysis, findings, and conclusion that the Schwab Account (x3561) constituted a marital asset and/or had any marital component?

8. Whether the trial court abused its discretion and committed error(s) of law in its analysis, findings, and conclusion that [Husband] is not entitled to a weighted distribution of the proceeds of the sale of oil, gas, and mineral rights?

9. Whether the trial court abused its discretion and committed error(s) of law in its analysis, findings, and conclusion that [Husband] had "no cognizable claim" to [Wife's] airline benefits?

10. Whether the trial court abused its discretion and committed error(s) of law in rejecting [Husband's] claim for reimbursement in the amount of Twenty-Three Thousand One Hundred Ninety-Six Dollars and Twelve Cents ($23,196.12) of mortgage, utility, and upkeep expenses on marital property during [Wife's] exclusive possession [of the Farm]?

Husband's Brief at 5-7.[1]

## DISCUSSION

We review Husband's issues for an abuse of discretion. This Court has explained:

---

[1] Husband's ten issues are related to and subsumed in the eight issues he raised with the trial court in his concise statement.

Our standard of review when assessing the propriety of an order effectuating the equitable distribution of marital property is whether the trial court abused its discretion by a misapplication of the law or failure to follow proper legal procedure. We do not lightly find an abuse of discretion, which requires a showing of clear and convincing evidence. This Court will not find an abuse of discretion unless the law has been overridden or misapplied or the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record. In determining the propriety of an equitable distribution award, courts must consider the distribution scheme as a whole. We measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights.

*Jagnow v. Jagnow*, 258 A.3d 468, 471–72 (Pa. Super. 2021) (citation omitted). It is the province of the trial court to weigh evidence and decide credibility, and this Court will not reverse credibility determinations "so long as they are supported by the evidence." *Childress v. Bogosian*, 12 A.3d 448, 455 (Pa. Super. 2011) (citation omitted). In addition, a DHO's report and recommendation, "although only advisory, is to be given the fullest consideration, particularly on the question of credibility of witnesses, because the [DHO] has the opportunity to observe and assess the behavior and demeanor of the parties."[2] *Id.* at 456 (citations omitted).

Most of Husband's issues relate to the characterization of assets — most notably, the $800,000 transferred to the parties' children — as marital property. The Divorce Code defines marital property as "all property acquired

_____

[2] The trial court described the DHO's First Report and Recommendation as "exhaustive." TCO at 14. The trial court has also provided a comprehensive analysis of the parties' claims. *Id.* at 1-41.

- 9 -

by either party during the marriage." 23 Pa.C.S. § 3501(a). The statute "presumes that property acquired during marriage is 'marital.'" *Yuhas v. Yuhas*, 79 A.3d 700, 704 (Pa. Super. 2013) (citations omitted). To refute the presumption, the party asserting that property acquired during the marriage is not marital must prove by a preponderance of the evidence that the property is not marital. *Lowry v Lowry*, 544 A.2d 972, 978 (Pa. Super. 1988). Section 3501 of the Divorce Code provides definitions for non-marital property.

Here, Husband asserts:

In this case, the trial court granted [Wife's] request to include the $800,000 in the valuation of the marital estate and to charge [Husband] with receiving the $800,000 as an advance on equitable distribution. This distribution had the effect of granting [Wife] virtually 100% of the liquid assets in the marital estate. [Husband] maintains that the trial court's distribution was punitive rather than equitable.

Husband's Brief at 35.

In his first and second issues, Husband claims the trial court erred in finding that he dissipated $800,000 from the marital estate, and argues that Wife was required "to prove dissipation beyond a preponderance of the evidence." *Id.* at 21. He contends the court improperly required him "to prove the elements of 'a legally binding agreement regarding an alleged plan to distribute $400,000 to each of the parties' two emancipated children.'" *Id.* According to Husband, "the DHO and the trial court acknowledged [Husband had no intent] to deprive [Wife] of a fair share of the marital estate." *Id.*

- 10 -

In his third and fourth issues, Husband continues to argue that the trial court erred "in reflexively charging [him] $800,000 as if he had received it as an advance." *Id.* at 22. He claims he was improperly credited with receiving more than $1,000,000 in advanced equitable distribution. Husband states:

> [T]he DHO and trial court engaged in clear and unmistakable accounting errors in charging [Husband] with receiving $1,032,883 in advances, which included $77,074.38 which were just transfers between accounts that were counted once when they left one account and again when they arrived in another. The trial court also charged [Husband] with receiving an advance of $50,000 when [he] actually paid this money to [Wife] pursuant to [a c]ourt [o]rder.

*Id.*

In his fifth issue, Husband claims that by crediting him with receiving more than $1,000,000 in advance of equitable distribution, the trial court abused its discretion by awarding 91% of the marital estate to Wife. *Id.* at 48. Husband asserts that the trial court "confiscated [his] retirement savings and left [him] with monthly debt obligations that exceed his income." *Id.* at 50-51.

Husband's sixth issue also pertains to monies credited to him as part of equitable distribution. He claims the trial court erred by denying him alimony because he "will be unable to meet his reasonable needs in accordance with even the most meager existence, let alone the lifestyle to which he has become accustomed." *Id.* at 52. Husband states that the court's "refusal to award alimony highlights the inequity of the distribution scheme in its entirety." *Id.* at 55.

- 11 -

In his remaining four issues, Husband assails the trial court's characterization and distribution of: Schwab account x3561; proceeds from the sale of the Farm's oil, gas and mineral rights; Wife's employee-related airline benefits; and $23,196.12 Husband paid in expenses for the Farm when it was occupied exclusively by Wife.[3]  ***See id.*** at 55-65.

Wife disputes all of Husband's claims, and asks that this Court "affirm the decision of the lower court, thereby confirming the June 25, 2024 Second Remand Report and Recommendation issued by [the DHO], which incorporated the [First] Report [and] Recommendation and the December 11, 2023 Remand Report and Recommendation."  Wife's Brief at 9.  Wife maintains that, "without question," neither the DHO nor trial court abused their discretion.  ***Id.***  We agree.

Much of Husband's argument relates to credibility determinations.  This Court may not disturb credibility findings when they are supported by the evidence.  ***Childress***, 12 A.3d at 457.  Moreover, the record supports the trial court's factual findings and legal reasons for rejecting Husband's issues.  The court discussed the applicable law pertaining to equitable distribution and alimony, and specifically discussed Section 3501 of the Divorce Code regarding non-marital property.  ***See*** TCO at 25-28.

Notably, the trial court expressed "disagree[ment] with Husband's contention that the $800,000, which Husband unilaterally transferred to the

_____

[3] Wife had exclusive possession of the Farm for 10½ months from July 2021 to May 2022.  ***See*** TCO at 4.

parties' children, was Husband's sole and separate property." *Id.* at 24. The
court explained:

> The record evidence demonstrates that Wife's name was added as
> a titled owner of the Cikovic [F]amily [F]arm in February of 1999,
> during the parties' marriage, when the parties re-financed
> Husband's existing mortgage relating to the property. … Husband
> clearly benefitted from Wife's ownership as entireties of the real
> property. Furthermore, Husband and Wife maintained this type
> of property ownership for 22 years and refinanced the mortgage
> on the property on one or two additional occasions during this
> period of time. A significant mortgage balance remains attached
> to the property of which Wife is an obligor.

*Id.* at 24 (citations omitted).

> The court also observed:

> The record evidence demonstrates that on July 6, 2021, Husband
> caused to be wired from a Schwab investment account (titled in
> his name, No. xxxx3561) $400,000 to each of his emancipated
> children. The $800,000 was transferred by Husband from the
> Schwab investment account approximately a week after the
> parties physically separated but eight days before July 14, 2023,
> the determined legal date of separation.

*Id.* at 13 (citation omitted). The court stated that it gave "great weight" to
the DHO's credibility determinations because the DHO "heard the testimony
and observed the witnesses' demeanor on the witness stand at the hearing."
*Id.* at 20. The court relayed:

> During Husband's testimony…, he was at times vague in his
> description of Wife's involvement. He spoke in general terms
> about the discussions for the use of the [$800,000] funds being
> done at the dinner table or other times. When asked several times
> on direct about Wife's understanding of this being an agreed upon
> use of the funds, he at first gave the somewhat vague response
> akin to "we all discussed it," but did say at one point that it was
> discussed with Wife.

> Wife clearly and unequivocally testified that there was no agreement to use these funds for a residence solely for the children and, that in no uncertain terms, she would never have agreed to transfer $800,000 to her adult children.

*Id.* at 14 (citing DHO's Report and Recommendation, 6/23/23, at 8-10).  Thus, the court found "insufficient credible evidence in the record to establish that Wife agreed to give $800,000 in marital funds to her adult children."  *Id.* at 21 (underline in original).

The trial court has provided a thorough and well-reasoned analysis of Husband's issues.  After hearing oral argument, and reviewing the record, briefs, and applicable law, we agree that Husband's issues do not merit relief. The trial court did not err or abuse its discretion in resolving the parties' economic claims.  As our review aligns with that of the trial court, we adopt its opinion as our own.  The parties shall include a copy of the January 22, 2025 opinion in the event of future filings relating to equitable distribution.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

9/9/2025

- 14 -

FILED
January 22, 2025 3:27 PM
Office of the Prothonotary
Washington County, Pennsylvania
Notice of Judgment, Order or Decree
Served on January 22, 2025
Pursuant to Pa.R.C.P 236
To all parties or counsel of record.
See distribution list or docket for more information

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA
CIVIL DIVISION

| | | |
|---|---|---|
| MARGARET A. CIKOVIC,<br>Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| vs. | ) | 70 WDA 2025 |
| | ) | |
| BERNARD K. CIKOVIC,<br>Defendant. | ) | |
| | ) | |

## RULE 1925(a) OPINION

Before the Court is the Notice of Appeal filed on behalf of the Appellant Bernard K. Cikovic (hereinafter sometimes referred to as "Husband") in the above captioned case at Trial Court Docket No. 2021-4243. This Opinion is written pursuant to Pa.R.A.P. 1925(a)(1) and in support of the reasons for this Court's adoption of the Divorce Hearing Officer's Second Remand Report and Recommendation issued by Divorce Hearing Officer, J. Patrick Smider, Esq., on June 25, 2024.[1]

Appellant originally filed a Notice of Appeal on November 18, 2024 at Docket No. 1437 WDA 2024. On December 9, 2024, Appellant filed his Statement of Errors Complained of on Appeal Pursuant to Pa.R.C.P. 1925(b). Said appeal was quashed on January 3, 2025 since a divorce decree had not yet been filed. A divorce decree was filed on January 8, 2025. Appellant refiled his appeal on January 9, 2025 at Docket No. 70 WDA 2025. The Appellant sets forth the following arguments in his concise statement:

---

[1] The Divorce Hearing Officer filed a Report and Recommendation on June 26, 2023 and a Remand Report and Recommendation dated December 11, 2023, which were incorporated with the Second Remand Report and Recommendation adopted by the Court.

1. The Trial Court abused its discretion and committed error(s) of law in concluding that Appellant's transfer of Eight Hundred Thousand and 00/100 Dollars ($800,000.00) for the benefit of the Parties' children constituted a dissipation of the marital estate, and that Appellant should be charged with receiving the same as an equitable distribution advance.

2. The Trial Court abused its discretion and committed error(s) of law in charging Appellant with receiving an additional Three Hundred Thirty Thousand Eight Hundred Thirty Seven Dollars and 84/100 Dollars ($330,837.84) as equitable distribution advances from the Parties' Schwab Accounts and Checking Accounts when One Hundred Twenty-Six Thousand Six Hundred Thirty-Six and 29/100 Dollars ($126,636.29) of these proceeds were spent on joint marital obligations, Eighteen Thousand and 00/100 Dollars ($18,000.00) of these proceeds were paid to the IRS for a joint tax obligation, Fifty Thousand and 00/100 Dollars ($50,000.00) of these proceeds were double-counted as advances for both Appellee and Appellant, and Seventy-Seven Thousand Forty-Seven and 00/100 Dollars ($77,047.00) were transfers between accounts that were counted twice.

3. The Trial Court abused its discretion and committed error(s) of law in ordering a distribution of ninety-two percent (92%) ($1,083,476) of the marital estate available for distribution to Appellee, including ninety-nine percent (99%) ($978,650) of the retirement savings available for distribution.

4. The Trial Court abused its discretion and committed error(s) of law in its analysis, findings, and conclusion that Appellant was not entitled to alimony.

5. The Trial Court abused its discretion and committed error(s) of law in its analysis, findings, and conclusion that the Schwab Account (x3561) constituted a marital asset and/or had any marital component.

6. The Trial Court abused its discretion and committed error(s) of law in its analysis, findings, and conclusion that Appellant is not entitled to a weighted distribution of the proceeds of the sale of oil, gas, and mineral rights.

7. The Trial Court abused its discretion and committed error(s) of law in its analysis, findings, and conclusion that Appellant had "no cognizable claim" to airline benefits.

8. The Trial Court abused its discretion and committed error(s) of law in rejecting Appellant's claim for reimbursement in the amount of Twenty-Three Thousand One Hundred Ninety-Six and 12/100 Dollars ($23,196.12) of mortgage, utility, and upkeep expenses on marital property during Appellee's exclusive possession.

## **FINDINGS OF FACT**

The parties were married on February 7, 1993. Master's Initial Div. Hr'g Tr., vol. 1, 11, 2/21/23. There was an incident that occurred on June 30, 2021 and Wife filed a Petition for Protection from Abuse (hereinafter "PFA") against Husband on July 2, 2021. *Id.* at 107-8; *see also* Wife's Ex. A. Wife subsequently filed a Complaint in Divorce on July 6, 2021. *Id.* at 108; *see also* Wife's Ex. B. The parties did not see each other again until the PFA hearing on July 14, 2021. *Id.* at 157-58.

Two children were born of this marriage, both of whom are adults. *Id.* at 16. Appellee Margaret A. Cikovic (hereinafter sometime referred to as "Wife") resides in Florida. *Id.* at 11. She was born on June 17, 1960. *Id.* at 41. She is employed as a flight attendant for American Airlines and has been employed since 1986. *Id.* at 70. Husband resides in Florida as well, although he currently has exclusive possession of the martial property at 21 T 335 Eldersville Road, Burgettstown, PA 15201 (hereinafter the "Cikovic Family Farm" or "Farm").[2] *Id.* at 191. Husband grew up in the farmhouse at the Cikovic Family Farm. *Id.* at 267. He was born on November 12, 1952. *Id.* He was employed in the personal financial consulting field but is now retired. *Id.* at 194.

After the parties' separation date of July 14, 2021, Wife initially retained exclusive possession of the marital residence pursuant to an agreement reached by the parties at a PFA

---

[2] In his reports, DHO Smider references the marital home as the "Burgettstown residence" or "Burgettstown property".

proceeding. *Id.* at 33. A Consent Order was entered on July 14, 2021, in which the parties agreed to Wife having sole and exclusive possession of the parties' residence. *See* Order of Court, 7/14/21. On March 25, 2022, an Order of Court was entered, granting Wife exclusive possession of the residence with the requirement that Wife be "solely responsible for maintaining the marital residence, including but not limited to paying the mortgage, real estate taxes and home owner's insurance, in a timely manner while she was in exclusive possession of the marital residence." *See* Order of Court, 3/25/22. The Order further required Wife to "[maintain] the farm in the same manner which it was maintained by the parties prior to separation, including but not limited to mowing/maintaining the grounds, clearing trailways and removing fallen trees/debris so that the field(s) can be cut for hay." *Id.* Wife exercised exclusive possession of the marital residence from the date of separation until May 17, 2022. Second Remand Hr'g Tr., 17, 6/4/24.[3] Husband paid the mortgage, taxes, and insurance payments during the period of time that Wife had exclusive possession of the residence. *Id.* Husband spent approximately $23,000 relating to Cikovic Family Farm expenses, including paying the mortgage, utility and other expenses, while Wife had exclusive possession. *Id.* at 31.

The parties entered into oil and gas lease agreements during their marriage regarding the Cikovic Family Farm. Master's Init. Divorce Hr'g Tr., vol. 1, 204-205, 2/21/23. A Quitclaim Deed was executed on June 27, 2011, that conveyed Wife's oil, gas and mineral rights (hereinafter sometimes referred to as "OGM rights") to Husband. *Id.* at 206; *see also* Hr'g Tr., vol. 2, 352-531, 2/22/23; *see also* Husband's Ex. 9. Wife was not aware what she was signing because Husband handled all marital financial issues. Hr'g Tr., vol. 1, 79-80, 143-44, 2/21/23. Husband created an LLC called "Jefferson Resources, LLC" and transferred his interest in the

---

[3] The Second Remand Hearing Transcript is incorrectly dated June 28, 2024 on the cover page.

OGM rights to Jefferson Resources LLC in April of 2013. *Id.* at 206; *see also* Husband's Ex. 10. Husband unilaterally sold the OGM rights relating to the Cikovic Family Farm to a third party in April of 2021 for approximately $717,000. *Id.* at 225. The proceeds from the sale were deposited into a Jefferson Resources, LLC account and subsequently transferred to Schwab Account (x3561). *Id.* at 218-19.

On July 6, 2021, Husband transferred $400,000 to each of his two emancipated children (totaling $800,000) from Schwab account (x3561). *Id.* at 50-51, 225. The transfer of $800,000 in marital funds occurred approximately one week after the parties physically separated following a dispute at the residence on or about June 30, 2021. DHO's Report and Rec., 7, 6/23/23. The parties' legal date of separation (hereinafter "DOS") is July 14, 2021. *Id.* The transfer of $800,000 to the parties' children was primarily funded by the sale of the OGM rights for $717,000. Hr'g Tr., vol. 2, 350, 2/22/23.

Husband testified that the transfer of $400,000 to each of the children was done to 1) help both children pay off their student loans and 2) provide each child with a $300,000 deposit so they could "purchase their homes". Hr'g Tr., vol. 1, 225-26, 2/21/23. Husband testified that there was no other motivation for him to make that payment as his motivation was so that he would be consistent with his desire to wind down his business, pay bills, and pay the children. *Id.* at 263. Husband testified that this plan was discussed with Wife. *Id.* at 215-16, 228. The testimony presented at trial differed as to the intended purchase of a home. Wife testified that she, along with Husband and their two children, were actively looking at prospective houses together with the intent of having all four names on the title to the real property. *Id.* at 106, 181. Wife further testified that there was no agreement to use marital funds to purchase a residence

5

solely for the children and she would not have agreed to transfer $800,000 to the adult children. *Id.* at 54-55, 105-6, 170.

Husband testified that the parties and the children had conversations around the dinner table regarding the plan to sell the OGM royalties and give the proceeds to the children as their inheritance. *Id.* at 215-216. Husband explained that he, Wife and the children discussed this plan *ad nauseam. Id.* Husband transferred the $800,000 to the adult children with the understanding that the children would use the funds to pay off school loans and purchase "homes". *Id.* at 225-226.

The parties' son, Carter Cikovic, testified that the parents entered into an agreement with the children to give each of them $400,000 after the sale of the OGM rights. Hr'g Tr., vol. 2, 309, 2/22/23. Wife received no consideration for the transfer of the $800,000 to the children. *Id.* at 310.

Both children testified that approximately $600,000 of the $800,000 was used as a non-refundable down payment on the purchase of a single home in Connecticut with a purchase price of approximately $1,500,000. *Id.* at 280, 304, 451. Both children refused to answer questions regarding the details of the property that was purchased. The parties' son was not willing to disclose the address of the home. *Id.* at 303. Carter testified that the purchase of the home involved a life estate but did not disclose the owner's identity. *Id.* at 305-306. Sydney Cikovic, the parties' daughter, also testified that the down payment was irrevocable. *Id.* at 410. The children did not consult Wife or Husband regarding this purchase. *Id.* at 359.

Wife testified that she contributed approximately $215,000 of non-marital monies to the marriage through the sale of her non-marital Grayson Bankshares, Inc. stock at Husband's behest in September of 2009. Hr'g Tr., vol. 1, 72-73, 2/21/23; *see also* Wife's Ex. GG. Husband

6

inherited an undetermined amount of money from his father when his father passed. *Id.* at 232. The inherited funds were held in a joint account owned by Husband and his father, and subsequently converted into Schwab Account (x3561) in Husband's name after his father died. *Id.*

Husband voluntarily retired June 30, 2021. *Id.* at 192. Wife testified that she was not aware of Husband's retirement. *Id.* at 100-101. At the time of the initial hearing, Wife wanted to retire, as she has "'a severe cyst on [her] spine and two disc problems in [her] lower back." *Id.* at 41. Husband thought Wife wanted to continue to work. *Id.* at 224. Also on June 30, 2021, Husband paid himself $40,000 by a personal check. *Id.* at 236. On July 1, 2021, Husband withdrew $2,200.00 from the Bank of America Account No. xx7471. First Remand Hr'g Tr., 19, 11/28/23.

The record evidence demonstrates that Husband paid $18,000.00 to the Internal Revenue Service (hereinafter "IRS") on July 23, 2021, which was approximately nine (9) days after the parties separated. Second Remand Hr'g Tr., 14, 6/4/24. Husband asserts that the payment was for estimated quarterly income taxes. *Id.*

## PROCEDURAL HISTORY

The above captioned matter was initiated by the filing of a Complaint in Divorce by Wife on July 6, 2021, raising claims of divorce, equitable distribution, alimony, and counsel fees and expenses. Husband filed a Petition Raising Claims on March 2, 2022, raising claims of APL, alimony and exclusive possession of the Cikovic Family Farm.

A Consent Order of Court was entered on July 14, 2021, granting Wife sole and exclusive possession of the Cikovic Family Farm. Husband filed a Petition for Special Relief to Reinstate Health Benefits, TSA Benefits and Retrieve Personal Effects on July 28, 2021. A Petition for

7

Advance on Equitable Distribution was filed by Wife on July 28, 2021. A Consent Order of Court, in consideration of the respective Petitions for Advance on Equitable Distribution and for Special Relief to Reinstate Health Benefits, TSA Benefits and Retrieve Personal Effects, was filed on August 13, 2021, granting each party an advance of $50,000.00 from one of the parties' 7 existing Charles Schwab accounts.[4] On December 28, 2021, Wife filed a second Petition for Advance on Equitable Distribution. On December 28, 2021, via a Court Order, Wife and Husband were granted allowance to take an additional $50,000.00 distribution from their respective IRA accounts as an advance to equitable distribution.

On February 23, 2022, Husband filed a Petition for Special Relief seeking exclusive possession of the Cikovic Family Farm, possession of a tractor to be returned to a third-party owner, and requesting to receive airline flight discounts and to reimburse Husband for missed opportunities to use said discounts. A February 23, 2022 Order granted Husband's request for the tractor to be returned to the third party. On March 25, 2022, after a hearing, this Court entered an Order granting Wife exclusive possession of the Cikovic Family Farm and allowed Husband to continue to receive airline flight discounts due to Wife's employment. Both parties waived notice to the entry of a final Decree of Divorce. *See* Wife's Waiver, 4/28/22; *see also* Husband's Waiver, 4/29/22. Husband filed a Notice of Intention to File the Praecipe to Transmit Record Establishing Grounds for Divorce on May 3, 2022. A Consent Order was entered on May 17, 2022, granting Husband exclusive possession of the Cikovic Family Farm.

An Order was entered June 15, 2022, pursuant to a Petition for Special Relief filed by Wife on June 16, 2022.[5] The Order instructed Husband to provide a complete accounting to

---

[4] Wife was also ordered to continue to carry Defendant on her health insurance coverage and Defendant was granted access to the Cikovic Family Farm to retrieve certain items.
[5] Husband's Response to Petition for Special Relief was filed on June 14, 2022.

Wife regarding any withdrawals and/or transfers he made from Charles Schwab Account Nos. xxxx-3561, xxxx-0914, xxxx-0040 and xxxx-6201 from June 1, 2021 to the present date. On July 6, 2022, an Order of Court was entered, prohibiting Husband from transferring, converting, selling, dissipating, disbursing, assigning, spending, or withdrawing any funds from the marital Charles Schwab accounts nos. xxxx3561, xxxx5809, xxxx0914, xxxx0040, and xxxx6201.

On July 12, 2022, an Order was entered stating that the parties established grounds for a Divorce pursuant to Section 3301(c) of the Pennsylvania Divorce Code. On July 15, 2022, a Motion for Appointment of Master was filed on behalf of Husband. On July 15, 2022, J. Patrick Smider, Esquire was appointed Divorce Hearing Officer (hereinafter "DHO Smider"). The Master's Conference/Hearing was originally scheduled for August 15, 2022, then ultimately rescheduled to February 21 and 22, 2023.

Husband filed a Petition for Special Relief on September 1, 2022, requesting to unfreeze one of the Charles Schwab accounts to retrieve $55,000.00. Wife filed her Response to Defendant's Petition for Special Relief on September 1, 2022. The request was denied by way of Court Order dated August 31, 2022. Husband repeated his request to unfreeze the Charles Schwab accounts by filing a Petition for Reconsideration of Order Denying Special Relief, which was filed on December 16, 2022. Wife's Response to Defendant's Petition for Reconsideration of Order Denying Special Relief was filed on December 16, 2022. The petition was denied by Court Order dated December 15, 2022.

Divorce Hearing Officer Smider presided over the Divorce Hearing on February 21, 2023 and February 22, 2023 and issued a Report and Recommendation dated June 26, 2023. Both parties filed Exceptions to DHO Smider's Report and Recommendation on July 12, 2023. Oral argument was held on September 19, 2023. On October 12, 2023, this Court issued an Order,

9

denying Husband's exceptions in its entirety and granting Wife's sole exception. The case was remanded back to DHO Smider for additional proceedings to "determine if it is necessary to re-distribute the Chase Account No. xx0021, Bank of America Account No.xx7471, Bank of America Account No. xx1889, and the marital residence located at 21 T 335 Eldersville Road, Burgettstown, PA 15201 to effectuate the financial distributions as set forth in the Divorce Hearing Officer's Report and Recommendation filed on June 26, 2023." *See* Order of Court, 10/12/23.

On November 28, 2023, the first Remand Hearing was held before DHO Smider who issued a Remand Report and Recommendation dated December 11, 2023. Husband filed Exceptions to DHO Smider's Remand Report and Recommendation on December 28, 2023. The Court, after oral argument, entered an Order dated April 9, 2024, denying all of Husband's exceptions except for Husband's Exceptions No. 11 and 13. The case was once again remanded to the DHO Smider for additional proceedings to 1) determine if Husband paid $18,000.00 to the Internal Revenue Service for the Parties' joint tax obligations and 2) determine if Husband shall be given an offset for any marital expenses paid by Husband during Wife's period of exclusive possession over the Cikovic Family Farm.

On June 4, 2024, a second Remand Hearing was held before DHO Smider. DHO Smider issued a Second Remand Report and Recommendation dated June 25, 2024. Husband filed Exceptions to the Divorce Hearing Officer's Second Remand Report and Recommendation Dated June 25, 2024 on July 12, 2024. Oral argument was held September 25, 2024 and this Court entered its Memorandum and Order on October 22, 2024. In that Order, this Court denied all of Husband's exceptions and adopted the Divorce Hearing Officer's Second Remand Report and Recommendation apart from Exception No. 7. The Court granted Husband's Exception No.

10

7 and struck language from the DHO's recommended order regarding the pre-judgment interest in DHO's Remand Recommendation.

On November 18, 2024, Husband's counsel originally filed a Notice of Appeal at Docket No. 1437 WDA 2024. On December 9, 2024, Husband's counsel filed his Concise Statements. Said appeal was quashed on January 3, 2025 since a divorce decree had not been filed. A divorce decree was subsequently filed on January 8, 2025. Husband refiled his appeal on January 9, 2025 at Docket No. 70 WDA 2025.

## STANDARD OF REVIEW

An appellate court reviews "a challenge to the trial court's equitable distribution scheme for an abuse of discretion." *Hess v. Hess*, 212 A.3d 520, 523 (Pa. Super. 2019), citing to *Brubaker v. Brubaker*, 201 A.3d 180, 184 (Pa. Super. 2018). The Court does not "lightly find an abuse of discretion, which requires a showing of clear and convincing evidence." *Id.* The Court "will not find an abuse of discretion 'unless the law has been overridden or misapplied or the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record.'" *Id.*, citing to *Carney v. Carney*, 167 A.3d 127, 131 (Pa. Super. 2017). Abuse of discretion can also be found through failure to follow proper legal procedure. *Busse v. Busse*, 921 A.2d 1248, 1257 (Pa. Super. 2007) (internal citations omitted). "When reviewing an award of equitable distribution, 'we measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights.'" *Hess*, 212 A.3d at 523, citing to *Hayward v. Hayward*, 868 A.2d 554, 558 (Pa. Super. 2005).

"When determining the propriety of an equitable distribution award, this Court must consider the distribution scheme as a whole." *Conner v. Conner*, 217 A.3d 301, 309 (Pa. Super.

11

2019), citing to *Mundy v. Mundy*, 151 A.3d 230, 236 (Pa. Super. 2016). "We do not evaluate the propriety of the distribution order upon our agreement with the court's actions nor do we find a basis for reversal in the court's application of a single factor. Rather, we look at the distribution as a whole in light of the court's overall application of the 23 Pa.C.S.A. § 3502(a) factors for consideration in awarding equitable distribution. If we fail to find an abuse of discretion, the order must stand." *Id.*, citing to *Harvey v. Harvey*, 167 A.3d 6, 17 (Pa. Super. 2017). Finally, it is within the province of this Court to weigh the evidence and decide credibility and the appellate Court will not reverse those determinations if they are supported by the evidence. *Id.*, citing to *Brubaker*, 201 A.3d at 184. Furthermore, it is within the sound discretion of this Court to determine whether an asset is part of the marital estate. *Fishman v. Fishman*, 805 A.2d 576, 578 (Pa. Super. 2002), citing to *Brody v. Brody*, 758 A.2d 1274, 1279 (Pa. Super. 2000).

As for alimony specifically, "[a]n appellate court's "standard of review over an alimony award is [also] an abuse of discretion." *Gates v. Gates*, 933 A.2d 102, 106 (Pa. Super. 2007).

## DISCUSSION

1.    **Transfer of Eight Hundred Thousand and 00/100 Dollars ($800,000.00)**

Husband first argues that the Trial Court abused its discretion and committed error(s) of law in concluding that Husband's transfer of Eight Hundred Thousand and 00/100 Dollars ($800,000.00) constituted a dissipation of the marital estate, and that Husband should be charged with receiving the same as an equitable distribution advance.

a.    Husband Asserts There Was an Agreement for the Parties' Children to Receive $400,000 Each

Husband contends that an agreement existed for the parties to give each of their adult children $400,000. He argues that the Court ignored contradictions in Wife's testimony, ignored

12

testimony of the parties' children and ignored text messages corroborating Husband's and the children's versions of the events in question. *See* Husband's Br. in Support of Exceptions to the Master's Report and Rec. Dated June 23, 2023, 9/12/23. Husband further argues that there is no competent evidence in the record to support Wife's claim of dissipation, therefore the Court erred in relying on the Divorce Hearing Officer's credibility determinations when deciding this issue. *Id.*

Wife argues that Husband failed to meet his burden in establishing that an agreement existed for the parties to give their children $400,000 each. *See* Wife's Br. in Response to Def.'s Br. in Support of Exceptions to the DHO's Report and Rec. Filed June 23, 2023, 9/18/2023. Wife further contends that the $800,000 wired to the children by Husband on July 6, 2021 did represent marital funds. *Id.*

It is well established that the burden of proving an oral contract is on the party seeking to establish it. *Boyle v. Steiman*, 631 A.2d 1025, 1033 (Pa. Super. 1993).

The record evidence demonstrates that on July 6, 2021, Husband caused to be wired from a Schwab investment account (titled in his name, No. xxxx3561) $400,000 to each of his emancipated children. Master's Init. Divorce Hr'g Tr., vol. 1, 50, 2/21/23; *see also* Wife's Ex. P. The $800,000 was transferred by Husband from the Schwab investment account approximately a week after the parties physically separated but eight days before July 14, 2023, the determined legal date of separation. DHO's Report and Rec., 7, 6/23/23.

Husband testified that during the course of many months, if not over a year or more and prior to the $800,000 transfer, he and Wife had developed a plan that the OGM rights attributable to the entirety of the Cikovic family farm would provide to the parties' two children (son, age 29, and daughter, age 24, at the time of trial) certain monies. He testified that the goal was two-fold:

13

1) so that the children could pay off their student loans; and 2) so that homes could be purchased by the children. Hr'g Tr., vol. 1, 225-26, 2/21/23.

Divorce Hearing Officer Smider, in his able and exhaustive report, stated:

During Husband's testimony regarding these discussions, he was at times vague in his description of Wife's involvement. He spoke in general terms about the discussions for the use of the funds being done at the dinner table or other times. When asked several times on direct about Wife's understanding of this being an agreed upon use of the funds, he at first gave the somewhat vague response akin to "we all discussed it" but did say at one point that it was discussed with Wife.

Wife clearly and unequivocally testified that there was no agreement to use these funds for a residence solely for the children and, that in no uncertain terms, she would never have agreed to transfer $800,000 to her adult children. Wife did acknowledge that in 2020 and in 2021, she, Husband and the children looked for a residence in the northeast (and other geographical locations, including Florida) which they could purchase with the intent of placing all four names on the title to real property if, in fact, they made a decision to purchase a specific property. Husband's Exhibit 37 contains an email dated June 23, 2021 (just a week before the parties physical separation) from the parties' realtor, Dana Lansing to two other realtors, that Husband and Wife "...still have an interest" in certain property and they have let her know that "they have increased their offer to $1,700,000." There is no mention of the children. This is not to say that the children would not be titled owners in addition to Wife and Husband but it does indicate what it specifically says and that is that the parties to this divorce action have the interest in the property and the parties to this divorce action have increased their offer.[6]

In addition, Husband does not acknowledge the obvious which is that all four family members were involved in looking for a property. However, Husband ceased the "all four involved in the choosing of a home" arrangement (which he documented in his Exhibit 37 and that which he verified in his testimony) when he unilaterally transferred $800,000 to the children on July 6, 2021. Your DHO also places emphasis on Husband's own testimony when he said that he believed that the dispute between the parties erupting on or about July 2, 2021 would pass and he did not believe a divorce was eminent. Yet, Husband altered the apparent plan of action (of all four individuals being involved in the search of a family home as evidenced by Exhibit 37 and other evidence), when he gave the children $400,000 each without any further consideration of these parents continuing to be involved, as they had been, in searching for a home. In addition, Husband relinquished the $800,000 and then, according to Husband and the children, had no further

---

[6] Your DHO acknowledges that the previous page this Exhibit has a subsequent, next day email from Ms. Lansing to Husband and the son confirming that the listing agent received the offer. Wife and daughter were not included in this email. However, the first described email is consistent with Wife's understanding and the second email does not confirm that only the children would be titled owners

14

involvement in the searching for and the purchase of the home which is completely contrary to the practice and arrangement the parties had in searching for and evaluating properties collectively.[7] This is born out in the testimony of all four individuals although we acknowledge that not all four may view a property in person. This is simply and utterly contrary to even Husband's alleged plan of involving the children and himself (as well as Wife according to Exhibit 37 and the testimony) in a potential purchase of a residence and quite simply, is contrary to a commonsense evaluation of the evidence based upon everyone's involvement prior to July 6, 2021 and as late as June 21, 2021 (less than ten days prior to physical separation). Clearly, there are too many contrary matters of evidence and reasonable conclusions to be drawn therefrom which would result in the fact finder to not agree with Husband's assertion of an alleged plan/and or agreement.

There is no written document and no writing evidencing he alleged "agreement" as represented by Husband.[8] There are no video or audio recordings indicating an alleged "agreement" between the parties for the use of the subject monies. In the best supporting evidentiary light given to Husband's position, one could understand that the parties were in fact looking to buy a "family residence" for all four individuals up until June 30, 2021 without binding any of them and that the parties would consider making sure that the children's educational debt would be considered by them so that the children might be free from college educational debt at some time in the future without Husband and Wife binding themselves as to any specific obligation. From a legal perspective, Husband's position must fail.

Husband sold the OGM rights to a third-party Buyer on April 19, 2021 (making settlement less than three months before separation) for $717,000.

Before a contract can be found, all of the essential elements of the contract must exist. Johnston the Florist, Ine v. TEDCO Constr. Corp 657 A.2d 511, 516 (Pa. Super. 1995) Therefore, in determining whether an agreement is enforceable, one must examine whether both parties have manifested an intent to be bound by the terms of the agreement, whether the terms are sufficiently definite and whether consideration existed. Id. On the last item alone, "consideration", Husband is unable to meet his burden of proof of a legally binding agreement. Wife has received nothing by the transfer of $800,000 to her adult children even if one were to construe the purchase of real property as part of the agreement, Wife clearly did not intend that she would have no interest in any potential real property purchase. This was succinctly stated by the parties' son who, pursuant to question by your DHO as to what his mother received as a result of this alleged agreement, he responded "Nothing".

---

[7] All four were not present at any given time to view a home in person. Due to travel or other scheduling matters one or two of these individuals would at times view a home or homes in person. In addition, they did view the homes over the internet and collectively communicated with each other about homes.

[8] There are text messages and emails indicating that the parties and the children were involved in looking for real property for a family home but none of these indicate an agreement as alleged by Husband.

In fact as testified by both children, approximately $600,000 of the $800,000 was used by them as a "non-refundable" down-payment on real property which is the subject of a life estate of another person not a party to this alleged agreement the children allegedly did not consult with Husband prior to making the non-refundable down payment and certainly did not consult with their mother contrary to the pattern of involvement of all four of these individuals up to the time of at least ten days before the parties' physical separation. The children would not disclose the particulars of the property which they have allegedly "purchased" and provided no documents to support their alleged "purchase". Both children indicated that they were employed in the financial services industry but would not disclose their income which may have supported conclusions that they did or did not have a need for the purchase. This bears repeating. The children did not indicate a need for the purchase of real estate. They do not live at the property in question nor is there any evidence that they have a need to reside at that property in the future. The monies which were allegedly used for the son's educational debt was not fully utilized for that purpose which was surprising to Husband. Wife, on the other hand, indicated complete surprise, if not shock by her demeanor and her testimony when she testified, that her grown children who are gainfully employed were given the rather large amount of $800,000. Accordingly, the terms of the alleged "agreement" were not only not sufficiently definite they were inconsistent with parties' collective actions up to late June of 2021.

In addition, Wife's actions in looking into real property for a "family home" did not and do not rise to the level of manifesting an intent to be bound by a transfer of $800,000 to the parties' adult and gainfully employed children with no conditions and without Wife providing a specific approval after the parties' physical separation.

By finding that there was no agreement with the children for the transfer of $800,000 to them without any conditions, what have the children lost. The answer is nothing If one were to take them at their word that approximately $600,000 has been used as a non-refundable deposit for real property with an existing life estate (as questionable as that sounds and having provided no evidence of the alleged purchase), they are out nothing and they have provided no consideration to the parties.[9] Again, the son's own word defines the consideration issue when he says his mother received "Nothing". In addition, when asked the question as to whether he would provide financial assistance to his father should it be determined that the $800,000 is part of the marital estate, the son unequivocally indicated that he would not. Again, Husband provided no evidence of the consideration which the children provided regarding this alleged "agreement" if it is love and affection (which was not testified about), that has been lost to Wife because she is completely alienated from the children apparently because of this Divorce and the children still have the benefit of having received $800,000. Husband has used the word "agreement" throughout this action to describe the $800,000 transaction and never described it as a gift. Even if Husband, now calls the $800,000 transaction a gift, Wife never,

---

[9] Husband did not testify about any consideration he received nor any consideration that Wife received.

16

ever understood that there would be a transfer of money to the children for the purpose of purchasing a home solely for these two children.

DHO's Report and Rec., 8-15, 6/23/23.

DHO Smider found Husband's testimony to not be credible regarding an alleged agreement to provide $800,000 to the parties' children. The Divorce Hearing Officer's report and recommendation, although only advisory, are to be given the fullest consideration, particularly on the question of credibility of witnesses, because the Divorce Hearing Officer has the opportunity to observe and assess the behavior and demeanor of the parties. *See Moran v. Moran*, 839 A.2d 1091 (Pa. Super. 2003); *see also Moser v. Renninger*, 116 A.2d 1107 (Pa. Super. 2015).

The record evidence demonstrates that Wife was not aware that Husband was going to transfer a total of $800,000 from the Charles Schwab account to the parties' two children on July 6, 2021. Hr'g Tr., vol. 1, 51, 2/21/23. Wife testified that Husband never discussed with her transferring a total of $800,000 to the parties' two children prior to making the wire transfers on July 6, 2021. *Id.* She did not authorize the transfer of these funds to the children. *Id.* at 54. Furthermore, she had never seen any estate retirement plan prepared by Husband or other financial expert indicating that on July 6, 2021 the parties were going to distribute $400,000 gifts to the parties' two children. *Id.* Wife testified that she had never discussed this transfer of funds to the children with Husband at any time over the course of the last ten years. *Id.* at 54-55. Wife also testified that there is no writing that exists which establishes that Wife, on the verge of retiring, agreed to give the vast majority of her assets to her two children on July 6, 2021. *Id.* at 55.

The parties' son, Carter, testified at trial. Carter testified that he and his sister Sydney were involved in discussions with their parents, over a long period of time, regarding the OGM

17

rights relating to the farm. Hr'g Tr., vol. 2, 276, 2/22/23. The discussions related to whether the parents would continue to collect the royalties or whether they would sell the royalties outright. *Id.* Carter stated that, to his knowledge, the family ultimately agreed to sell the oil and gas rights. Carter testified that the family further agreed that the proceeds from the sale of the oil and gas rights would be used to purchase a family home in the northeast. He testified that the proceeds would also be used to pay down Carter and Sydney's student loans. *Id.* at 277. Carter testified that he received $400,000 via a wire transfer on July 6, 2021, which he believed was a gift from his parents to be utilized as a down payment on a home and pay off remaining student loans. *Id.* at 279.

Carter testified that he did not possess any documents, recordings, videos or any other evidence to support his testimony that his parents agreed to give him $400,000 as a gift. *Id.* at 293. He testified that he could not remember the moment when his parents offered to give him $400,000, or where he was at the time. *Id.* at 292. He explained that the decision for him and Sydney to each receive $400,000 from their parents as a gift was culmination of years of conversations between the parents and the children. *Id.*

He testified that he and his sister, Sydney, used $600,000 of the combined $800,000 which they had received from Husband via wire transfer to place a non-refundable deposit on a home. *Id.* at 280, 303-304. He explained that a third party is holding the $600,000 "irrevocably" as part of a life estate. *Id.* at 305. Carter refused to disclose, when asked on cross-examination, the owner of the property who was holding the $600,000. He testified that the purchase price of the property was in the range of $1,500,000 and he and his sister will have a mortgage for the balance. *Id.* at 304. He provided no documents to support his testimony regarding the "purchase" of the property. DHO Smider correctly stated, at the time of the hearing, that

18

Carter's refusal to answer questions on cross-examination regarding the purchase of the property impacts his credibility as a witness. *Id.* at 307.

The parties' daughter, Sydney, testified at trial. Sydney testified that she was involved in discussions with her parents and her brother regarding the oil and gas rights relating to the farm. *Id.* at 432. The discussions began somewhere around 2018 or 2020. *Id.* She testified that a decision was made in 2021 to sell the oil and gas rights with the intended purpose of buying a house for her and her brother with the proceeds. *Id.* at 405. She testified that some of the proceeds would be used to pay tuition regarding business school which she was starting in July of 2021. *Id.* at 406. Sydney testified that she received $400,000 via a wire transfer from her father on July 6, 2021 which she believed was a gift from his parents. She considered this money to be an inheritance. *Id.* at 433. Sydney never reached out to her mother to acknowledge that she received the funds or to thank her mother for the gift. *Id.* at 445. Sydney testified that she did not possess any documents, recordings, videos or any other evidence to support her testimony that her parents agreed to give her $400,000 as a gift. *Id.* at 440-441. She testified that she and her brother used $600,000 of the combined $800,000 which they had received from Husband via wire transfer to place a non-refundable deposit on a home. *Id.* at 451, 461. The monies committed to the purchase of the property are irrevocable. *Id.* at 410. She testified that there is a life estate involved in the purchase of the property. *Id.* at 451. Sydney testified that if she could give the money back to her parents, she would. *Id.* at 416-417. She later changed her testimony and stated that if the $600,000 were refunded by the property owner, she would not give the money back to her parents. *Id.* at 454-455.

In similar fashion to her brother, Sydney refused to disclose the owner of the property who was holding the non-refundable $600,000 deposit. *Id.* at 451-452. Sydney refused to

19

disclose the identity of the individual who had a life estate in the property. *Id.* at 452. She refused to disclose the location or address of the property that she and her brother purchased other than stating that it was located in Connecticut. *Id.* at 451.

The DHO accepted Wife's testimony regarding the transfer of these funds as "credible and believable." DHO's Report and Rec., 15, 6/23/23. DHO Smider set forth in his report that he found "Wife's testimony in this regard not only to be credible and believable, but Wife has provided her testimonial evidence in a clear and convincing manner leaving no doubt in the mind of your DHO that she did not have an agreement with either Husband or Husband and the children to provide the monies to the children as asserted by Husband." *Id.* at 16.

It is clear that DHO Smider did not find the children to be credible witnesses. He considered Carter and Sydney's testimony regarding using $600,000 as a non-refundable deposit for real estate to be "questionable". DHO's Report and Rec., 14, 6/23/23. Furthermore, the DHO clearly set forth that the children's refusal to disclose the details of the property which they have allegedly "purchased" impacts their credibility as witnesses. Hr'g Tr., 307, 2/22/23; *see also* DHO's Report and Rec., 13, 6/23/23. Again, this Court gives great weight to DHO Smider's credibility determinations because he was the person who heard the testimony and observed the witnesses' demeanor on the witness stand at the hearing. *See Mintz v. Mintz*, 392 A.2d 747, 749 (Pa. Super. Ct. 1978) ("In general, a trial court examining the factual findings of a master or an appellate court reviewing the trial proceedings may use a broad scope of review, but great weight must nevertheless be accorded to the findings of the master ... where issues of credibility must necessarily be resolved by personal observation.").

20

There is insufficient <u>credible</u> evidence in the record to establish that Wife agreed to give $800,000 in marital funds to her adult children. Therefore, like the DHO, this Court finds Appellant has not met his burden of proving the existence of an oral agreement in this case.

      b.      <u>Husband Asserts the $800,000 Represents His Sole and Separate Property</u>

Husband argues that the oil and gas rights are his sole and separate property because he obtained the oil and gas rights prior to marriage.[10] *See* Defendant's Exceptions to the Master's Report and Recommendation Dated June 23, 2023, 7/12/23.

With regards to this issue, the DHO stated:

Since August of 1959, Husband's parents owned the land the DHO designated as the Burgettstown property and since 1960, the property also had a four-bedroom house and detached garage on what was a one-acre parcel. This home is where Husband grew up. On January 25, 1991 (prior to the marriage) Husband's father gifted the home to Husband. Subsequently, Husband purchased an adjoining acre from his uncle. Within a year thereafter (again prior to marriage), Husband purchased a neighboring farm for $155,000, and the entire real property constituted approximately 128 acres of land at that time. Shortly after marriage, Husband subdivided some of this real property into lots (eventually sold off) and the property consists today of approximately 90 acres of land with the home and garage. Husband and others refer to this as the "farm".

In February of 1999 (seven years into a twenty-nine year marriage), the parties re-financed Husband's existing mortgage on the farm property which required Wife's name to be added as a titled owner of the property and obligated Wife on the mortgage. Husband says that he did this in order to receive better mortgage terms for the property. Id at 17. The parties again refinanced the debt on the farm property on at least one other occasion and Husband testified that there may have been a third refinancing and a significant mortgage balance remains attached to the property at this time. From the time that Wife's name was added to the property and she became an obligor on the mortgage, the parties apparently conducted themselves as if their incomes (both employment and investment income) were fungible except that husband controlled the finances and Wife was not an active participant in the financial operation of the marriage. Again, Husband provided no evidence that the parties segregated their incomes. As Wife explains it, she left the financial aspect of the marriage in Husband's hands as she was what he called a "mental midget"[11]. In essence, by Husband refinancing the mortgage on the marital

---

[10] Husband's sale of the oil and gas interests relating to the Cikovic family farm in April of 2021 primarily funded the $800,000 transfer of funds to the children.

[11] This testimony by Wife was left unrefuted by Husband.

residence on two or three occasions with Wife as a titled owner, the marriage and thus, he himself, benefitted from Wife's ownership as entireties of the real property constituting a residence either by lower interest rates and/or use of funds representing the mortgaged amounts. Husband and Wife operated under this assumption of entireties property for the next 22 years without event. Husband never testified that he segregated monies which he considered his own to pay the monthly mortgage and expenses for this residence. In fact, the opposite is true, Wife apparently trusted Husband with her income to pay the obligations of the marriage. The mortgage on this property was an obligation of the marriage. There is no evidence whatsoever that Husband ever indicated to Wife that the obligation she was under (and is still under to this day) was not a part of the marriage.

Harkening back to Husband's decision to send $800,000 his children, Husband presents an irrational explanation and premise which involves this residence. **An additional plan of Husband's was for Husband to retire and Wife to keep working and the parties, according to Husband, would be able to live off of the assets via investment income as well as Wife's employment income and Husband's social security income while at the same time Husband sending $800,000 to the children.**[12] What is irrational is that when Husband sent $800,000 to the children, he decided to keep the mortgage on this residence. The mortgage balance due and owing on this property around DOS was approximately $241,000. Again, this is a mortgage which obligates Wife for years especially if something should happen to Husband.[13] Arguably, even if there was a plan to share all or part of $800,000 with the children, common sense would dictate that Husband would simply propose that the three entities would share equally the $800,000. Each child could receive $266,666 and the marriage could receive $266,668, thereby paying off the mortgage on the Burgettstown residence with money to spare (perhaps to pay down the debt on Husband's Mercedes or both Mercedes vehicles) and each child would be debt free from educational expenses while at the same time Husband and Wife would be free from their only mortgage at the ages of early sixties and nearly seventy (at that time), respectively. It also makes sense from Husband's alleged planning position and that is that if the Burgettstown residence is a multi-generational farm as indicated by Husband, then Husband's children could receive the property free from any mortgage upon the demise of the parties. If they didn't want to keep "the farm", they could sell it and invest the proceeds in their co-ownership of a residence. The children lose nothing by virtue of this scenario. At the ages of these parties in the later years of their life and near the end of their work life, rational (and credible) individuals would eliminate debt. This is especially true of a mortgage which Wife would have been obligated to be responsible for (even without a Divorce), for perhaps the rest of her life.[14]

---

[12] Husband did say that even if Wife retired this plan of his would financially work.

[13] Neither party has indicated the existence of life insurance policies which, regarding the $241,000 mortgage, would have put either party in a better financial position should either party meet their demise before the mortgage is paid off.

[14] Husband presented no plan to retire the mortgage obligating Wife and simple math would indicate that the monthly mortgage payment of $1,417 on a payoff of approximately $241,000 which accrues interest on the unpaid balance obligates the parties for another twenty (20) years when they will be approximately 82 and 90 respectively.

In addition, the proof is in the proverbial pudding in that based upon the distribution recommended below by your DHO, Wife is still saddled with the marital obligation of the mortgage on the marital residence unless Husband refinances to remove her as an obligor and Husband, according to his self-serving testimony, is forced to live on Social Security Retirement income as his alleged sole source of income calling into question his ability to address Wife's marital obligation, the mortgage, all the while benefitting from Wife's being included in this asset for the last 22 years. It does not matter that the parties did not live at this residence for a majority of the marriage. Husband at all times benefited from the use of his Wife and cannot now assert that his benefit was a mere formality, not once by refinancing, but at least one other time and possibly a third time by refinancing and use of Wife's income over the years. Husband was not forced to refinance the first time and the resultant adding of Wife to the ownership of the marital residence which benefitted him. This was his choice, his plan, and there is no doubt according to the evidence that he and not Wife, controlled the finances during the marriage and it was he who benefited by adding Wife as an owner 22 years prior to separation. Wife also contributed significant cash monies to the marriage (see discussion below). Accordingly, Husband received the benefit of Wife's cash contribution and her obligation to be responsible for the joint mortgage attached to the joint property. Husband has the burden to prove that he did not have the donative intent regarding the marital residence by clear and convincing evidence and he has failed to do so even by a preponderance of the evidence. Again, Husband has not carried his burden regarding the Burgettstown residence by even a preponderance of the evidence.

Husband's equitable remedy is not a declaration that this residence is not marital in nature but that a skewed distribution should be made in his favor because he brought certain assets to the marriage tempered by consideration of Wife's assets which she brought to the marriage (see discussion below). This analysis is not, repeat not, a dollar for dollar set off. To do so for a marriage of this length (which is considered long, nearly 30 years), would be inequitable. Wife provided her stock sale proceeds and the proceeds from the sale of her pre-marital residence ($80,000 to $90,000 according to her unrefuted testimony). Those two assets ceased to exist in their original form upon being donated to the marriage Consideration of Husband's contribution of assets the marriage is more nuanced. While it is true that we have values for the Burgettstown property and the OGM proceeds, the assets themselves continued to exist during this long marriage and were the subject of a transmutation over the years as fully part of the marital estate. One could easily find that there should not be a skewed distribution of certain assets in favor of Husband due to this transmutation. However, your DHO will err on the side of caution and provide a skewing of only the OMG proceeds as to a skewing of a certain asset, again tempered by the fact that Wife brought approximately $300,000 to the marriage which far exceeds the net value of the Burgettstown property.

23

The parties do not dispute the appraised value of that real property of $435,000. Pursuant to ED factor 10.2, that gross amount is reduced by the cost of sale of $30,450. The value is further reduced by the significant mortgage balance of $240,916. Therefore, the net value for purposes of Equitable Distribution is $163,634.12.[15]

DHO's Report and Rec., 16-22, 6/23/23.

This Court disagrees with Husband's contention that the $800,000, which Husband unilaterally transferred to the parties' children, was Husband's sole and separate property. This Court relies on the Divorce Hearing Officer's report and recommendation as well as the testimony and evidence presented at the DHO's hearing and finds that the $800,000 transferred by Husband to the children represents marital funds. The record evidence demonstrates that Wife's name was added as a titled owner of the Cikovic family farm in February of 1999, during the parties' marriage, when the parties re-financed Husband's existing mortgage relating to the property. Hr'g Tr., vol. 1, 23, 2/21/23; *see also* Husband's Ex. 6. As stated above, Husband clearly benefitted from Wife's ownership as entireties of the real property. Furthermore, Husband and Wife maintained this type of property ownership for 22 years and refinanced the mortgage on the property on one or two additional occasions during this period of time. Hr'g Tr., vol. 2, 364, 2/21/23. A significant mortgage balance remains attached to the property of which Wife is an obligor. Hr'g Tr., vol. 1, 96-97, 2/21/23; *see also* Wife's Ex. MM. As the DHO correctly set forth in his report, Husband has the burden to prove by clear and convincing evidence that he did not have the donative intent regarding the Cikovic family farm. *See Madden v. Madden*, 486 A.2d 401 (Pa. Super. 1984) (Property owned prior to the marriage or acquired in exchange for premarital property that is subsequently transferred to the parties as tenants by the entireties becomes marital property absent clear and convincing evidence to the contrary).

---

[15] The date of value of the Burgettstown residence was the parties' choice and that which includes the mortgage balance date of $240,916 further discussed below.

Husband did not meet his burden and his argument that the oil and gas rights are his sole and separate property, therefore, must fail.

c. Quitclaim Deed Conveying Wife's Interests in OGM Interests to Husband

Husband also argues that the oil and gas rights are his sole and separate property because Wife waived her interest in the oil and gas rights by Deed. *See* Defendant's Exceptions to the Master's Report and Recommendation Dated June 23, 2023, 7/12/23.

The DHO stated:

The parties entered into oil and gas lease agreements for the Burgettstown residence during the marriage. Both parties were signatories as Lessors. In June of 2011, Husband caused to be prepared a Quit Claim Deed conveying Wife's interest in the OGM interests in the Burgettstown property solely to Husband. Wife testified that she did not know what she was signing when she executed the Quit Claim Deed and would never have intended to give up her rights solely to Husband. She testified that he took care of the marital financial interests during the marriage and she believed that he was addressing financial matters. She credibly testified that words were never spoken to her about these rights. Wife testifies that she was simply required by Husband to execute the Deed and again, Husband was the financial manager for the marriage and Wife was the mental midget. Wife received no consideration for executing that Deed in Husband's purported favor. Furthermore, Husband has not pointed to any "valid agreement of the parties entered into during the marriage" which would cause the interests to be determined to be non-marital property (Section 3501(a) and 3501 (a) (2) of the Divorce Code).

Husband subsequently explored the possibility of selling the OGM interests in the Burgettstown residence and eventually created an LLC in April of 2013, Jefferson Resources, LLC, and transferred his interest in the rights to Jefferson Resources, LLC approximately one month later in May of 2013. Husband unilaterally decided to sell the OGM rights for the Burgettstown residence to a third party, closing in April 2021 for $717,000.

Based upon the forgoing, your DHO has determined that the proceeds from the sale of OGM interests to a third party by Husband are marital property.

However, there is further proof that these proceeds are marital in nature. Husband's position is that the family (Husband, Wife and their two children) discussed the use of monies to allegedly gift the children a significant amount of money. Husband, at all times pertinent hereto, viewed the potential OGM sale proceeds as that which would accomplish the alleged "agreement". In Husband's own words, the family talked about this and Husband at all times incident thereto, allegedly understood

25

that these monies, in order to be utilized for a family purpose, would need to be discussed with all members of the family. Therefore, Husband viewed these monies as family monies. He did not view these monies as his own monies which he could do with as he pleased. Otherwise, he would never have had to include Wife in the discussions of the use of the monies. The most damning testimony against these monies being Husband's sole and separate property came from his own children who testified that the alleged "agreement" was understood by all family members utilizing family monies (the OGM sale proceeds). Not one time did either child indicate that these proceeds were solely "my father's money" and they did not have to include "my mother" in the discussion. Husband may have had a better argument by simply asserting from the beginning that the OGM interests were his and his alone, Wife relinquished all rights to them and he did not need her permission, let alone her involvement, in order to gift the monies to his children. But no, Husband and especially the children felt otherwise about the monies and specifically sought, or at least included, "mom's" involvement in the discussions. However, because of another legal analysis, Husband's claim to exclude the $800,000 from the marital estate still fails.

Even if a court would determine that Wife relinquished all right, title and interest in OGM interests to Husband without a valid agreement by virtue of the Quit Claim Deed, those interests would be considered excluded from the marital estate as non-marital property from the time of relinquishment and the increase value of non-marital property during the marriage would be the subject of Equitable Distribution (Section 3501(a) which defines marital property as the increase in value of non-marital property during the marriage). There was no agreement between Husband and Wife about the OGM interests when Wife executed the Quit-Claim Deed and Husband has not indicated what the agreement was. The Divorce Code does provide for the exclusion of property from the marital estate which is defined as "Property excluded by valid agreement of the parties entered into before, during or after the marriage" (emphasis added Section 3501(a)(2)). Husband has not set forth any valid agreement and any terms and/or consideration regarding the parties OGM rights.

However, if Husband could show that the OGM sales proceeds were derived from his separate non-marital property, effective the date of the Quit-Claim Deed (June 27, 2011) that being the subsurface rights of the entirety of the Burgettstown real property, he would still have to provide values for the OGM interests from that date to the date of the sale of those rights.

Husband has not valued the subsurface rights at the time of the Quit-Claim Deed. That would be his burden under this latter analysis in order to validly exclude some portion of the interest from the increase in value during the marriage. Because Husband did not, the assigned value to those subsurface interests as of the date of the Quit-Claim Deed is zero ($0). Husband sold the rights during the marriage which represents the increase in value of these specific subsurface rights during the

26

marriage, the entirety of which is deemed to be marital and the subject of Equitable Distribution (Section 35011{a)) pursuant to his alternat analysis.

To be clear, your DHO finds that there was no valid agreement for Wife relinquishing her OGM rights and she received no consideration for executing the Quit Claim Deed.[16]

DHO's Report and Rec., 23-27, 6/23/23.

Like the DHO, this Court finds that the proceeds from the sale of the OGM interests to a third party by Husband are marital.

Title 23, Section 3501 of the Pennsylvania Consolidated Statutes excludes from the definition of marital property, the following:

(1) Property acquired prior to marriage or property acquired in exchange for property acquired prior to the marriage.

**(2) Property excluded by valid agreement of the parties entered into before, during or after the marriage.**

(3) Property acquired by gift, except between spouses, bequest, devise or descent or property acquired in exchange for such property.

(4) Property acquired after final separation until the date of divorce, except for property acquired in exchange for marital assets.

(5) Property which a party has sold, granted, conveyed or otherwise disposed of in good faith and for value prior to the date of final separation.

(6) Veterans' benefits exempt from attachment, levy or seizure pursuant to the act of September 2, 1958 (Public Law 85-857, 72 Stat. 1229)1, as amended, except for those benefits received by a veteran where the veteran has waived a portion of his military retirement pay in order to receive veterans' compensation.

(7) Property to the extent to which the property has been mortgaged or otherwise encumbered in good faith for value prior to the date of final separation.

(8) Any payment received as a result of an award or settlement for any cause of action or claim which accrued prior to the marriage or after the date of final separation regardless of when the payment was received.

---

[16] Therefore, one does not necessarily have to delve into the latter analysis provided by your DHO (the lack of evidence of the increase in value of a non-marital asset).

23 Pa. Cons. Stat. Ann. § 3501(a).

As stated above, the record evidence demonstrates that Wife received no consideration for executing the Deed in Husband's favor. Furthermore, no evidence was presented which establishes that the parties entered into a valid agreement during the marriage which would preclude classifying the OGM as marital property subject to equitable distribution. *See Chandler v. Chandler*, 236 A.3d 1068 (Pa. Super. 2020).[17]

### 2. Advances Charged to Husband

Husband next argues that the Court abused its discretion and committed error(s) of law by charging Husband with receiving an additional Three Hundred Thirty Thousand Eight Hundred Thirty-Seven Dollars and 84/100 Dollars ($330,837.84) as equitable distribution advances from the parties' Schwab Accounts and Checking Accounts.

#### a. Husband Asserts Proceeds Spent on Joint Obligations

Husband initially raised the argument, regarding proceeds which he claimed were spent on joint marital obligations and/or a joint tax obligation, by filing Exceptions to the Divorce Hearing Officer's Second Remand Report and Recommendation dated June 25, 2024. The undersigned denied Husband's exception by way of Memorandum and Order dated October 21, 2024. The reasons for the Court's October 21, 2024 Order already appear of record in said Memorandum and Order. Therefore, this Court hereby incorporates the same as its Pa.R.A.P. 1925(a) Opinion and attaches it hereto.

---

[17] Even if Husband argues he did not need to provide evidence of an agreement, "[s]uch an agreement is subject to the same rules as all other contracts... '[U]nder the law of contracts, in interpreting an agreement, the court must ascertain the intent of the parties.'" *Id.* (internal citations omitted). DHO Smider and this Court finds there was no intent on Wife's part that would showcase an agreement.

b.     Value of Schwab Accounts

After a two (2) day hearing, the DHO issued a Report and Recommendation dated June 23, 2023. The thorough and detailed Report and Recommendation included DHO Smider's determination of the value of the Schwab accounts.

With regards to the determination of the value of the Schwab accounts, the DHO stated:

The marital Charles Schwab financial accounts as indicated by Wife at the time of separation (which evidence is accepted by your DHO) are designated as follows:

| | | |
|---|---|---|
| Schwab Acct. No. XX0040 | | 93 |
| Schwab Acct. No. XX3561 | $ | 1,004,396 |
| Schwab Acct. No. XX5809 | $ | 127,074 |
| Schwab Acct. No. XX0914 | $ | 461,256 |
| Schwab Acct. No. XX6201 | $ | 66,418 |
| Schwab Acc No. XX8577 | $ | 21,635 |
| Schwab Acct. No. XX5399 | $ | 21,351 |
| Subtotal | $ | 1,702,224 |

DHO's Report and Rec., 49, 6/23/23.

On July 12, 2023, Husband filed eighteen (18) Exceptions to the Master's Report and Recommendation dated June 23, 2023.[18] As correctly noted by the DHO, Husband did not file an Exception challenging the DHO's determination of the value of the Schwab accounts. DHO's Remand Report and Rec., 5, 12/11/23. Therefore, the issue regarding the DHO's determination of the value of the Schwab accounts is waived. *See Nagle v. Nagle*, 799 A.2d 812, 821 (Pa. Super. Ct. 2002) ("Initially, we note that this issue is waived because it was not included in exceptions to the master's report and therefore was neither presented to nor addressed by the divorce court.").

---

[18] This Court denied Defendant's Exceptions by way of Court Order dated October 12, 2023.

29

c.      Value of Chase Account and Bank of America Accounts

Wife also filed one (1) Exception to the DHO's Report and Recommendation. This Court granted Plaintiff's Exception and remanded the case to the DHO for limited proceedings to "determine if it is necessary to re-distribute the Chase Account No. xx0021, Bank of America Account No.xx7471, Bank of America Account No. xx1889, and the marital residence located at 21 T 335 Eldersville Road, Burgettstown, PA 15201 to effectuate the financial distributions as set forth in the Divorce Hearing Officer's Report and Recommendation filed on June 26, 2023." *See* October 12, 2023 Order of Court.

On November 28, 2023, a Remand Hearing was held before DHO Smider who issued a Remand Report and Recommendation dated December 11, 2023.

DHO Smider stated, in his Remand Report and Recommendation:

Background regarding Wife's sole Exception is pertinent. Wife asserted in paragraph 4 of her Exception that the three financial accounts referenced in the Court's Remand order were determined by your DHO to have a collective Date of Separation (DOS) value of $103,566 but that following the close of the initial Hearings Husband set forth in his Proposed Findings of Fact and Conclusions of Law under the heading "Final Distribution of Marital Assets" that the collective balance of those three accounts was $23,045, at the time of preparation of those proposed findings (June 8, 2023). Those three accounts were specifically awarded to Wife in the Recommendation with the total value of $103,566. Wife asserted in her Exception that if the accounts now have a balance of $23,045 then she is entitled to that remainder of money plus the difference of the award of $80,521.00 to effectuate the equitable distribution scheme set forth in your DHO's Recommendation. She further asserted that she should receive the monies due and owing to her from the equity in the former marital residence designated as the Burgettstown property if Husband cannot otherwise pay the monies to Wife.

As it turns out, it was revealed by Husband at the Remand Hearing that the three accounts had minimal if any money remaining in them which, if Wife prevails in this Remand, she would be entitled to monies in excess of $103,000 in order to effectuate the subject equitable distribution scheme.

Husband asserts in this Remand that he used the entirety of the monies in these accounts to pay marital expenses and therefore, Wife's share of these accounts is zero.

30

DHO's Remand Report and Rec., 4-5, 12/11/23.

The DHO correctly utilized the date of separation values for Chase Account No. xx0021, Bank of America Account No.xx7471 and Bank of America Account No. xx188. The record evidence demonstrates that the date of separation balance for Chase Account No. xx0021, Bank of America Account No.xx7471 and Bank of America Account No. xx188 totaled $103,566. *Id.* at 6; *see also* Wife's Exhibits BB, CC, and DD. The record evidence further demonstrates that Husband maintained and controlled these accounts as of the date of separation through the date of the Remand Hearing. *Id.* at 13, 55-59; *see also* Wife's Exhibits BB, CC, and DD.

d.      Husband's Use of Funds/Claim for Credits

Husband asserted at the Remand Hearing that he utilized the funds from Chase Account No. xx0021, Bank of America Account No.xx7471 and Bank of America Account No. xx188 solely to pay marital debt and expenses. Husband testified that on a monthly basis, he would wind up his affairs in these accounts. *Id.* at 13. This process would have happened whether the parties were getting a divorce or not. *Id.* Account x7471 had automatic bills that were being paid out, so Husband moved the monies from the x7471 account to the x1889 account. *Id.* at 15. The 1889 account was used to pay off marital debt from the other accounts. *Id.* at 13. However, under the x7471 account, Husband testified to specifically making payments for vehicle loans, phone payments, a loan regarding the farmhouse, cash withdrawals and transfers to the parties' son, Christian. *Id.* at 16-19. Husband specifically noted that once the monies were moved to the x1889 account, the amount was used primarily to pay off debt and the debts were all made prior to the separation. *Id.* at 23. It was used to pay off vehicles, insurance, tuitions

31

for the parties' children, mortgage, utilities, property maintenance, etc. *Id*. at 24. Husband believes he has spent $150,000 (but later affirmed in his testimony that the amount was close to $133,871.55) paying off the total marital expenses. *Id*. at 29-30; *see also* Husband's Exhibit RA, RB, and RC.

The DHO stated that Husband testified "in an overly broad assertion that he probably paid approximately $150,000 in marital expenses but did not direct your DHO to specific documentation in this regard." *Id*. at 10. The DHO further noted that "Husband's overall testimony was convoluted in that he constantly attempted to generalize his position without an objective foundation of enumerated expenses. Furthermore an[d] importantly, Husband never specifically testified about the entries on the remainder of the bank statements which he submitted." DHO's Remand Report and Rec., 11-12, 12/11/23. DHO Smider did not find Husband's testimony to be credible or believable about the credits he was requesting regarding use of these funds. *Id*. at 11. Again, this Court gives great weight to the DHO's credibility determinations. *See Mintz v. Mintz, supra.*

This Court agrees with the DHO's determination that Husband is not entitled to any credits from Wife's distribution of the three accounts in question. Husband failed to carry his burden of proof in the presentation of his case. He failed to provide credible testimony about the credits that he was requesting. Furthermore, as noted by the DHO, Husband failed to provide detailed testimony, supported by bank statements or other documentation, regarding the use of these monies. The court relied on the DHO Smider comprehensive Remand Report and Recommendation as well as the testimony and

32

evidence presented at the DHO's hearing in determining that Husband is not entitled to these credits.

### 3. Distribution of the Marital Estate

Husband next argues that the Court abused its discretion and committed error(s) of law by ordering a distribution of ninety-two percent (92%) of the marital estate to Appellee.

As set forth in detail in Section 1 above, the record evidence establishes that Appellant unilaterally transferred Eight Hundred Thousand and 00/100 Dollars ($800,000.00) to his children on July 6, 2021, which constituted a dissipation of the marital estate. Husband was charged with receiving the same as an equitable distribution advance. DHO's Report and Rec., 38, 6/23/23. Husband, in making the argument that he was only awarded eight percent (8%) of the marital estate, refuses to acknowledge that he was charged with receiving these funds. Husband's argument fails for lack of arguable merit.

### 4. Alimony

Husband next argues that the Trial Court abused its discretion and committed error(s) of law in its analysis, findings, and conclusion that Husband was not entitled to alimony.

Title 23 section 3701 sets forth the relevant factors the court shall consider in determining the nature, amount, duration and manner of payment of alimony. Section 3701 states:

> **(a) General rule.**–Where a divorce decree has been entered, the court may allow alimony, as it deems reasonable, to either party only if it finds that alimony is necessary,
>
> **(b) Factors relevant.**–In determining whether alimony is necessary and in determining the nature, amount, duration and manner of payment of alimony, the court shall consider all relevant factors, including:
>
> (1) The relative earnings and earning capacities of the parties.
>
> (2) The ages and the physical, mental and emotional conditions of the parties.

(3) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits.

(4) The expectancies and inheritances of the parties.

(5) The duration of the marriage.

(6) The contribution by one party to the education, training or increased earning power of the other party.

(7) The extent to which the earning power, expenses or financial obligations of a party will be affected by reason of serving as the custodian of a minor child.

(8) The standard of living of the parties established during the marriage.

(9) The relative education of the parties and the time necessary to acquire sufficient education or training to enable the party seeking alimony to find appropriate employment.

(10) The relative assets and liabilities of the parties.

(11) The property brought to the marriage by either party.

(12) The contribution of a spouse as homemaker.

(13) The relative needs of the parties.

(14) The marital misconduct of either of the parties during the marriage. The marital misconduct of either of the parties from the date of final separation shall not be considered by the court in its determinations relative to alimony, except that the court shall consider the abuse of one party by the other party. As used in this paragraph, "abuse" shall have the meaning given to it under section 6102 (relating to definitions).

(15) The Federal, State and local tax ramifications of the alimony award.

(16) Whether the party seeking alimony lacks sufficient property, including, but not limited to, property distributed under Chapter 35 (relating to property rights), to provide for the party's reasonable needs.

(17) Whether the party seeking alimony is incapable of self-support through appropriate employment.

(c) Duration.–The court in ordering alimony shall determine the duration of the order, which may be for a definite or an indefinite period of time which is reasonable under the circumstances.

**(d) Statement of reasons.**–In an order made under this section, the court shall set forth the reason for its denial or award of alimony and the amount thereof.

**(e) Modification and termination.**–An order entered pursuant to this section is subject to further order of the court upon changed circumstances of either party of a substantial and continuing nature whereupon the order may be modified, suspended, terminated or reinstituted or a new order made. Any further order shall apply only to payments accruing subsequent to the petition for the requested relief. Remarriage of the party receiving alimony shall terminate the award of alimony.

**(f) Status of agreement to pay alimony.**–Whenever the court approves an agreement for the payment of alimony voluntarily entered into between the parties, the agreement shall constitute the order of the court and may be enforced as provided in section 3703 (relating to enforcement of arrearages).

23 Pa.C.S.A. §3701.

Following equitable distribution, "alimony provides a secondary remedy and is available only where economic justice and the reasonable needs of the parties cannot be achieved by way of equitable distribution." *Balicki v. Balicki*, 4 A.3d 654 (Pa. Super. 2010). Alimony is based upon a party's reasonable needs, both in accordance with the lifestyle and standard of living established by the parties during the marriage, as well as the payor's ability to pay. *Teodorski v. Teodorski*, 857 A.2d 194 (Pa. Super. 2004).

With regard to the issue of alimony, the DHO stated:

Husband voluntarily chose to retire.[19] He gave no reason other than he simply wanted to wind up his self-employment. In addition, Husband has proffered no reason why he cannot be employed in some fashion or otherwise earn income in some fashion to offset his alleged expenses. As such, Husband has not carried his burden for an award of Alimony as he has clearly not manifested to your DHO an understanding of his income potential. It is unclear why Husband cannot earn income other than his monthly social security. Husband never testified that he had health problems or was unable to earn income. Therefore, your DHO cannot

---

[19] In this regard, your DHO finds Wife's testimony to be credible and believable that she did not know of Husband's decision to retire. Your DHO does not find Husband's testimony to the contrary, to be credible and believable. Strangely, Husband said that he indicated his retirement plans to Wife and that "she didn't do cartwheels" which would make one believe she did not agree to his "plan" even if she were informed. Of course, your DHO does not believe Husband informed Wife of his unilateral decision which Wife first learned of in Court during the party's PFA proceeding.

35

determine an amount of Alimony even if one were inclined to recommend an award of Alimony (which we do not).

DHO's Report and Rec., 47, 6/23/23.

The DHO further stated that "Husband is not entitled to an award of Alimony due to his improvident transfer of the $800,000 monies which could have been used for his living expenses of an ongoing nature." *Id.* at 39.

The court relied on DHO Smider's report and recommendation, as well as the testimony and evidence presented at the DHO's hearing in determining that Appellant is not entitled to alimony. The Court submits that the determination to not award Husband alimony is fair and equitable given the age of the parties, the parties' respective health, their station in life, their sources of income, their vocational skills, their employability and their individual needs. Furthermore, like the DHO, this Court has also considered the marital misconduct of Husband regarding his role in the dissipation of $800,000 in marital funds which has led to a depleted marital estate.

### 5.    Schwab Account (x3561) as Marital Asset

Husband's next matter complained of on appeal pertains the Schwab Account ending in (x3651). Husband contends that the Schwab Account (x3561) did not constitute a marital asset and/or had any marital component. This Court disagrees.

Husband testified that he inherited money from his father when his father died in 2013, and the inherited funds were in a joint account held by Husband and his father. Master's Init. Divorce Hr'g Tr., vol. 1, 232, 2/21/23. The joint account was subsequently converted into Schwab account (x3561) after Husband's father's passing. *Id.* The record evidence demonstrates that Husband sold the OGM rights relating to the farm in April of 2021 for approximately $717,000. *Id* at 216, 225; *see also* Husband's Ex. 14. The $717,000 in sale

36

proceeds were deposited into a Jefferson Resources LLC account which was owned by Husband. *Id.* at 218. Husband subsequently moved the sale proceeds from the Jefferson Resources LLC account to the Schwab Account (x3561). *Id.* at 219. The record evidence further demonstrates that the balance of the Schwab Account (x3561) on the date of separation was $1,004,396.39. Hr'g Tr., 50, 2/21/23; *see also* Wife's Ex. P.

On July 6, 2021, Husband caused to be wired from the Schwab Account (x3561) $400,000 to each of his children. Hr'g Tr., vol. 1, 50-51, 2/21/23. Husband testified that he was able to wire the children a total of $800,00 from the Schwab Account (x3561) using the $717,000 in OGM sales proceeds and "[w]hat was left" from Husband's father's account which he inherited. *Id.* at 225. As set forth in Section 1(b) above, this Court has determined that the $717,000 from the sale of the OGM rights is marital property.

The burden of proof rests with the party asserting that property acquired during the marriage is not marital property but separate. *Lowry v. Lowry*, 544 A.2d 972, 978 (Pa. Super. 1988). No testimony or evidence was presented at the hearing which established the initial balance of Schwab account (x3561) after it was converted from the joint account inherited by Husband. The record evidence demonstrates that the balance of Schwab Account (x3561) at DOS was $1,004,396.39. Hr'g Tr., vol. 1, 50, 2/21/23. Husband did not meet his burden of proof in claiming that any portion of the Schwab account, with a DOS balance of $1,004,396.39, was a non-marital asset. Again, the Court finds that the record in this matter is devoid of any evidence pertaining to the initial amount of money that Husband inherited from his father which was converted to the Schwab account and/or the balance as of the date of marriage.

For these reasons, we agree with the DHO's determination that the Schwab Account (x3561) is a marital asset subject to equitable distribution.

### 6. Sale of Oil, Gas, and Mineral Rights

Husband next argues that the Court errored by concluding that Husband is not entitled to a weighted distribution of the proceeds from the sale of the oil, gas, and mineral rights.[20]

Husband's argument lacks merit as the proceeds from the sale of the oil, gas, and mineral rights were skewed 55% – 45% in favor of Husband. DHO's Report and Rec., 52, 6/26/23.

With regards to this issue, the DHO stated:

In order to calculate the distribution of the Marital Estate, one must first back out the OGM proceeds of $717,000 from the DOS values of the Schwab accounts and apply the 55/45 split. Therefore, **Husband's share of the OGM proceeds is 55%, $394,350 and Wife's share is 45%, $322,650.**

DHO's Report and Rec., 52, 6/26/23.

The DHO further noted:

Based upon the evidence and in applying legal authority, your DHO recommends a distribution of the Burgettstown real property 50% to each party. In this regard, consideration has been given to Wife's contribution to the marriage of approximately $300,000 and the current net value of this real property of $166,634 and the skewed distribution of the OGM proceeds in favor of Husband for the same reason. Otherwise, the percentage distribution of the value of the residence the OMG sale proceeds would have been different but not a dollar for dollar set-off.

DHO's Report and Rec., 51, 6/26/23

The record evidence demonstrates that Wife contributed approximately $214,000 to the marriage by way of the sale of her non-marital Grayson National Bank stock at Husband's request in September of 2009. Master's Init. Divorce Hr'g Tr., vol. 1, 72-73, 2/21/23; *see also* Wife's Ex. GG. Wife testified that she also received approximately $80,000-$90,000, during the marriage, from the sale of a home that she owned prior to the parties' marriage. *Id.* at 11-13. The parties soon after purchased a 3-bedroom home in

---

[20] As set forth in Section 1(b) and 1(c) above, this Court has determined that the $717,000 in proceeds from the sale of the OGM rights relating to the Cikovic Family Farm is marital property.

38

Virginia. *Id.* Husband's financial contribution to the marriage, as set forth in detail in Section 2 above, includes the Cikovic Family Farm.

A trial court has broad discretion when fashioning an award of equitable distribution. *Dalrymple v. Kilishek*, 920 A.2d 1275, 1280 (Pa.Super. 2007). The DHO carefully considered the financial contributions that each party made to the marriage when deciding how to distribute the $717,000 in OGM proceeds. Under these circumstances, the Court finds that the DHO's decision to skew the distribution of the OGM proceeds 55%-45% in favor of Husband is sufficient to accomplish economic justice.

### 7. Airline Benefits

Husband next argues that the Court abused its discretion and committed error(s) of law in its analysis, findings, and conclusion that Husband had "no cognizable claim" to airline benefits.

Wife, through her employment as a flight attendant, received free air travel during the parties' relationship and continued to receive the benefit. Hr'g Tr., vol. 1, 124, 2/21/23; *see also* DHO's Report and Rec., 36, 6/26/23. Husband believes he is entitled to a monetary distribution from the marital estate for the elimination of no-cost air travel which the parties enjoyed during the marriage by virtue of Wife's employment. Hr'g Tr., vol. 1, 266-67, 2/21/23; *see also* DHO's Report and Rec., 35, 6/26/23. This Court disagrees.

The DHO explained that "[n]either Wife nor Husband could sell their air travel seats. They were not awarded seats on a jet. What they were able to utilize, is stand-by air travel at no cost if a seat was available to them. It is not 'property' which can be sold or distributed in a percentage or solely awarded to one party or the other." Master's Init. Divorce Hr'g Tr., vol. 1, 266, 2/21/23; *see also* DHO's Report and Rec., 35, 6/26/23.

39

Husband had previously benefitted financially from utilizing the no-cost air travel. Hr'g Tr., vol. 1, 223, 2/21/23; *see also* DHO's Report and Rec., 36, 6/26/23. However, as the DHO correctly set forth in his Report and Recommendation, Husband "cannot now reduce the Marital Estate to Wife's detriment for a benefit which did not cost either party anything and that which will still cost Wife nothing for her use in the future. To do otherwise, would essentially have Wife pay Husband for the elimination of this benefit for him from her share of the Marital Estate." DHO's Report and Rec., 36, 6/26/23. As way of example, the DHO explains that "if Husband values the no-cost air travel for a lost benefit to him in the future at the amount of $100,000, in a 50/50 case, he is seeking that Wife's share of the Marital Estate be reduced by $50,000 when there is no asset to take the $50,000 from. To do otherwise, would reduce Wife's share of the Marital Estate by the $50,000 from an asset or asset value to which she is otherwise entitled to in equitable distribution." *Id.*

Although the DHO did not calculate a monetary distribution to Husband, he did properly acknowledge and consider the loss of the benefit as the "lifestyle" considerations pursuant to his analysis of the 13 Equitable Distribution factors. *Id.* at 36, 61; *see also* Master's Init. Divorce Hr'g Tr., vol. 1, 266, 2/21/23. This Court agrees with the DHO that Wife's stand-by air travel benefit is not "property" which can be distributed by way of equitable distribution. Husband, since raising this argument in Exceptions filed on July 12, 2023, has failed to set forth a developed legal argument supported with citations to legal authority. *See* Husband's Br. in Support of Exceptions to the Master's Report and Rec. Dated June 23, 2023, 9/12/2023.

This Court further agrees with the DHO in finding that it is not a practical solution for Husband to continue to receive stand-by air travel benefits post-Divorce as that would be counterintuitive to finality in this Divorce action. DHO's Report and Rec., 36-37, 6/26/23.

## 8.    Claim for Reimbursement of $23,196.12

Husband, in his Concise Statement, further argues that he should have received a reimbursement in the amount of Twenty-Three Thousand One Hundred Ninety-Six and 12/100 Dollars ($23,196.12) regarding mortgage, utility, and upkeep expenses on marital property during Wife's exclusive possession of the farm.

Husband initially raised this argument by filing Exceptions to the Divorce Hearing Officer's Second Remand Report and Recommendation dated June 25, 2024. *See* Husband's Exceptions to the DHO's Second Remand Report and Rec. Dated June 25, 2024, 6, 7/12/2024. The undersigned denied Husband's Exception by way of Memorandum and Order dated October 21, 2024. The reasons for the Court's October 21, 2024 Order already appear of record in said Memorandum and Order. Therefore, this Court hereby incorporates the same as its Pa.R.A.P. 1925(a) Opinion and attaches it hereto.

### CONCLUSION

For the foregoing reasons, this Court denied Husband's Exceptions.

BY THE COURT:

DATE: January 22, 2025

_____ J.
JESSE PETTIT, JUDGE

Copies to:
Eric J. Yandrich, Esq.
Bradley M. Bassi, Esq.
Superior Court of Pennsylvania

41